### In re SOFAMOR DANEK GROUP, INC.

**Bruce G. MURPHY, Randy Owen, Mary Kennedy, and Lynda Kramer, Plaintiffs–Appellants,**

**Mike Roberts, Plaintiff,**

v.

**SOFAMOR DANEK GROUP, INC., E. Ron Pickard, Laurence Y. Fairey, Leander D. Beard, George F. Rapp, Miles D. Igo, Alan J. Olsen, Yves Paul Cotrel, and Phillipe Cotrel, Defendants–Appellees.**

Nos. 95–6491, 95–6592.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 22, 1996.

Decided Aug. 14, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 9, 1997.

Alexander W. Wellford, Jr. (briefed), Humphreys, Dunlap, Wellford, Acuff & Stanton, Memphis, TN, Steven J. Toll (argued and briefed), Cohen, Milstein, Hausfeld & Toll, Washington, DC, for Plaintiffs–Appellants.

Earle J. Schwarz (briefed), Saul C. Belz (briefed), Jennifer W. Sammons (briefed), Waring Cox, Memphis, TN, Kenneth M. Kramer (argued and briefed), Shearman & Sterling, New York City, for Defendants–Appellees.

Before: MERRITT, BROWN, and NELSON, Circuit Judges.

## OPINION

DAVID A. NELSON, Circuit Judge.

This is an appeal from the dismissal of five consolidated securities fraud cases. The plaintiffs—each of whom in 1993 and/or 1994 made one or two purchases of between 100 and 500 shares of common stock in the defendant corporation—allege that they and members of a shareholder class they purport to represent paid inflated prices for their stock because the company and its officers and directors publicly misrepresented the company's marketing practices and failed to disclose (1) that medical devices manufactured by the company were being promoted for a use not approved by the United States Food and Drug Administration and (2) that medical devices which the company lent to hospitals without initial charge under a "loaner kit" program were ultimately being sold to the hospitals at twice the regular list price.

Granting a motion for dismissal under Rule 12(b)(6), Fed.R.Civ.P., the district court concluded that the alleged misrepresentations and failures to disclose were not actionable under the federal securities laws and that the plaintiffs had failed to state a claim for common law fraud and negligent misrepresentation. We find ourselves in substantial agreement with the district court's analysis, and we shall affirm the dismissal.

I

Defendant Sofamor Danek Group, Inc., which has its headquarters in Memphis, Tennessee, was organized in 1983 as an Indiana corporation. Originally named Biotechnology, Inc., it was renamed Danek Group, Inc., a few years later. The company received its present name in June of 1993, when it acquired all of the capital stock of Sofamor, S.A., a privately held French company, in exchange for newly issued shares of Danek common stock.

The initial public offering of Danek stock took place in 1991, at which time 1.8 million shares—approximately 22 percent of all shares outstanding after the offering—were sold at $15.00 per share. The stock (which was subsequently split two-for-one) was traded on the over-the-counter market until shortly after the Sofamor acquisition; Sofamor Danek was then listed on the New York Stock Exchange. As of December 31, 1993, the company had 24,369,838 shares of common stock outstanding. During the fourth quarter of 1993 the price per share ranged between a low of $27.25 and a high of $38.75.

Sofamor, S.A., had been controlled by Dr. Yves Paul Cotrel (one of the defendants herein) and members of his family. A proxy statement/prospectus issued in connection with Danek's proposed acquisition of Sofamor indicated that upon completion of the acquisition the current officers and directors of Danek would be left with ownership of roughly one quarter of the outstanding stock of Sofamor Danek. Dr. Cotrel and his family—who were to receive two seats on the Sofamor Danek board of directors—would own a slightly smaller percentage.

It was further disclosed that the disposition of Sofamor stock would be a taxable transaction; that the Sofamor shareholders intended to sell a significant portion of the newly issued shares, amounting to roughly 10 percent of Sofamor Danek's total outstanding stock; that the Sofamor shareholders had entered into an agreement designed to provide for an orderly resale; and that prevailing market prices for Sofamor Danek stock could nonetheless be adversely affected by substantial sales. The proxy statement/prospectus also noted that there had been significant volatility in the market for Danek stock since the initial public offering, which volatili-

ty might continue or increase from time to time in the future.

Both Danek and Sofamor, as the proxy statement explained, were primarily engaged in the business of developing, manufacturing and marketing spinal implant devices for surgical use. Danek entered this business segment in the mid–1980s, producing spinal implant devices at an Indiana manufacturing facility and distributing them through a subsidiary located in Memphis. By 1991, according to a prospectus issued when the company went public, Danek had two main product lines; one consisted of specialized systems of support rods and eyebolt locking mechanisms, and the other—the Danek Bone Plate and Screw Product Line—consisted of devices attached to bones in the spine to achieve fixation during healing. Other fixation and implant systems had been added by 1993.

The principal products of Sofamor, S.A., included the Cotrel–Dubousset spinal instrumentation system, which was manufactured and sold in France beginning in 1983, and a newer line designed for the treatment of degenerative diseases of the lumbo-sacral spine. By 1993 Sofamor products were marketed in over 45 countries, including the United States.

Danek's 1991 prospectus contained a "Government Regulations" section noting that within the United States the Food and Drug Administration had authority over the company's medical devices by reason of the Safe Medical Devices Act of 1990 and the 1976 Medical Devices Amendment to the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301 et seq. The prospectus went on to say that all products currently marketed by Danek had gone through a regulatory procedure known as "Section 510(k) notification," a relatively simple method of obtaining FDA clearance for devices "substantially equivalent" to products legally marketed in the past. (The 1976 Act established grandfather rights for products that had been on the market before May 28, 1976.) Section 510(k) notification, according to the prospectus, is far less complicated than the "premarket approval" required for devices that are not eligible for 510(k) treatment. A premarket approval ap-

plication was said to be "a much more complex submission that typically includes a long follow-up of both animal and human studies."

In 1990, as the prospectus disclosed, the FDA advised Danek and a number of other manufacturers that they were not to promote bone plates, sacral screws, etc. for "pedicular attachment," which was said to be a "new use" for these devices. This meant that Danek could not label or promote its products as suitable for attachment to the pedicle—a boney support structure on the posterior aspect of the vertebral bodies that make up the human spine. Danek revised its promotional literature, the prospectus stated, to remove any reference to pedicular attachment. The prospectus noted that the company could not rule out the possibility of regulatory action, however, and said that such action might include an injunction against any distribution of the Danek Bone Plate and Screw Product Line. The possibility of such regulatory action was also disclosed in the annual Form 10–K filings made with the Securities and Exchange Commission for 1991 and each subsequent year through 1993.

In Europe and Asia, as the 1993 proxy statement explained, Sofamor was able to sell devices with screws intended to be inserted in the pedicle. Because use of a pedicle screw was not exempt from premarket approval by the FDA under § 510(k), however, Sofamor was said to have applied for permits to conduct clinical trials of pedicle screws preparatory to filing a premarket approval application for this use in the United States.

In connection with a discussion of *"Possible Regulatory Action Involving the Danek Bone Plate and Screw Product Line,"* the proxy statement also explained that as part of the practice of medicine—which is not itself regulated by the FDA—American physicians were free to use Danek screws (or any other products) in the pedicle portion of the vertebra if, in the exercise of their medical judgment, the physicians deemed such use to be in their patients' best interest. "Although this practice [also referred to as "interpediculiar segmental fixation"] probably will continue in the future," the proxy statement said, "Danek cannot predict nor does it encourage the use of products for

unapproved applications." Similar statements appeared in the company's 10–K forms for fiscal years 1992 and 1993.

The FDA might have disagreed with the proposition that Danek did not "encourage" use of the company's products for interpediculiar segmental fixation. In August of 1993, as the company disclosed in its Form 10–K for that year, "Danek and six other companies received warning letters from the FDA, primarily regarding the issue of supporting medical education programs that actually 'demonstrate' the use of screws in the pedicle of the spine."

The other marketing practice relevant in this litigation involves Danek's so called "loaner set" program. The 1991 prospectus said this on the subject:

"In meeting the needs of hospitals, the Company offers various instrument and implant purchase alternatives, as well as overnight shipment of implant systems for next day surgery. One of the Company's purchase alternatives consists of the Company furnishing a full set of products to a hospital without initial charge. After components are used during surgery, the set is returned to the company and the hospital is then charged only for the components used at a premium price per piece."

The company's Form 10–K for 1993 showed a year-end loaner set inventory of $6,065,000—representing more than a tenfold increase over the corresponding number in the Form 10–K for 1991. The company's regular inventory increased over the same time period from $4,892,000 to $21,189,000. Net sales from all sources came to $161,794,000 in 1993, according to the company's Form 10–K for that year, as opposed to 1991 sales which the same report set at $74,548,000.

## II

The present litigation began in April of 1994, when plaintiff Bruce G. Murphy—who alleged that he had purchased 100 shares of Sofamor Danek stock on August 20, 1993, at $33¼ per share—filed a class action complaint against the company and certain of its officers and directors in the United States District Court for the Western District of Tennessee. Four similar complaints were subsequently filed in the same court by other plaintiffs, and the cases were consolidated pursuant to a consent order that called for the complaints to be replaced by a single consolidated complaint. Such a complaint was then duly filed on behalf of the five named plaintiffs.

The consolidated complaint alleges that the named plaintiffs bought a total of 1,770 shares of Sofamor Danek stock at various times between February of 1993 and April of 1994 at prices ranging from $20⅞ per share to $36 per share. The complaint further alleges that between November of 1993 and February of 1994 the individual defendants—several of whom were officers of the corporation and all of whom served on its board of directors—sold a total of 728,043 shares (a little under three percent of all shares outstanding) at prices ranging from a low of $29.94 per share to a high of $36 per share. Named as the single biggest seller, not surprisingly, was Dr. Cotrel; he was said to have disposed of 255,354 shares at gross prices totaling $7,761,646.

In December of 1993, according to the complaint, the television program "20/20" ran a segment on the dangers of using pedicle screws in spinal fusion operations. Four days later the FDA issued an "Update on Pedicle Screws" in which it said that although such screws had been used on approximately 300,000 people in the United States alone, "not enough is known about the possible short-term adverse effects of the screws ... nor about their long-term effectiveness." Making reference to the letter of the previous August in which the FDA had warned manufacturers not to promote the use of orthopedic screws in the pedicles of the spine, the update reiterated that it was illegal for manufacturers to promote pedicular use through professional advertising and training courses.

In mid-January of 1994, the complaint says, Sofamor Danek announced that it had been sued by five patients who alleged that surgical screws had been used in their spines "illegally." The complaint implies that the

lawsuit was inspired by the "20/20" television program.

The complaint sets forth a wealth of sales and earnings data reported by the company, with accompanying commentary, including the results for the first quarter of 1994. In a press release issued on April 21, 1994, we are told, the company reported that first quarter sales had increased 13 percent over the figure for the corresponding period in 1993. This growth in sales was below the expectations of most stock analysts, the complaint says.

The company allegedly reported further bad news in a conference call with analysts on the same day as the press release. The company advised that it had recently been notified that its largest United States distributor would not meet its purchase commitment for the second quarter of 1994. "During the conference call," the complaint continues, "the Company also admitted that surgeons' fears of litigation relating to the off-label use of spinal screws in the pedicle was most likely negatively impacting spinal implant sales."

Primarily as a result of the April 21 statements, according to the complaint, the price of the stock dropped 3¾ points that day. It fell another 3⅛ points on April 22, 1994, closing at $12¾ per share. (It is a matter of public record that the price subsequently recovered; not until 1997, however, did it exceed $40 per share.)

The complaint avers that during the period from February 8, 1993, through April 21, 1994, the defendants made deceptive and materially false and misleading statements which, coupled with the defendants' failure to disclose information that allegedly ought to have been disclosed, caused the company's stock to trade at artificially inflated prices. The allegations in this regard are divided into three categories.

First, according to the complaint, the market was unaware that the company was improperly promoting its products for pedicular use and that such promotion was having a material impact on the company's financial position. The complaint says that it was not uncommon for the company's sales representatives to assist surgeons during operations in which Danek screws were inserted in the pedicle; that the company surreptitiously sponsored seminars at which pedicle fixation was promoted; that the company helped create and fund a non-profit foundation (the Spinal Science Advancement Foundation) to sponsor programs where physicians could see demonstrations of plate and screw pedicle fixation; and that in a conference call with stock analysts during October of 1993, the company's president "downplayed" the FDA letter in which the company had been warned that its support of such programs constituted promotion of medical devices for an unapproved use in violation of the law.

Second, according to the complaint, the market was ignorant of the fact that "improper" sales through the loaner set program constituted a significant source of the company's earnings. In this connection the complaint alleges that most hospitals believed they would pay only a small premium for items used from the loaner sets; that in fact hospitals were often charged premiums 100 percent over the regular list price; that the company immediately eliminated such premiums when hospitals complained, although sales representatives were sometimes banned from hospitals upon discovery of the premiums; that the company's president and executive vice-president "downplayed any positive financial effects from loaner sales" in the conference call with stock analysts in October of 1993; and that on January 1, 1994, the company reduced its loaner set premiums to approximately 29 percent.

Third, according to the complaint, the defendants failed to disclose in a timely manner that the exclusive distributor for product lines that accounted for 34 percent of Sofamor Danek's sales was not going to meet its purchase commitment for the second quarter of 1994 and would probably have its distribution contract terminated. The dismissal of this claim has not been pursued on appeal. We shall not discuss the claim further, therefore, except to note that problems associated with the termination of the distributor's contract contributed, as the plaintiffs themselves have alleged, to the decline in the price of Sofamor Danek's stock.

On October 5, 1995, after full briefing, the district court entered a 30–page order granting the defendants' motion to dismiss the consolidated complaint with prejudice.[1] The judgment implementing this decision was entered on November 6, 1995. Timely notices of appeal have been filed with respect to both the order and the judgment.

### III

■ The propriety of a dismissal pursuant to Rule 12(b)(6), Fed.R.Civ.P., is a question of law that is subject to *de novo* review. All factual allegations made by the plaintiff are deemed admitted, see *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1039 (6th Cir.1991), and ambiguous allegations must be construed in the plaintiff's favor. *Id.* at 1039–40. The district court may not grant a Rule 12(b)(6) motion based on disbelief of factual allegations in the complaint. See *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1041, 134 L.Ed.2d 189 (1996). Nevertheless, our standard of review "require[s] more than the bare assertion of legal conclusions." *Id.* "[W]e need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987).

■ Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, have the effect of prohibiting the commission of fraud in connection with the sale or purchase of securities. *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996). To state a cause of action under § 10(b) and Rule 10b–5 a plaintiff must plead that the defendant made a false statement or omitted to state a material fact which should have been disclosed, and that the plaintiff's reasonable reliance on the statement or omission proximately caused the plaintiff's injury. See *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir.1991); *San Leandro Emergency Medical Group Profit Sharing Plan v. Phil-*

*ip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996). Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as "having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (internal quotation marks and citation omitted).

■ Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure. See *Basic*, 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5"). Ordinarily, at least, a company is under no duty to disclose the details of its merchandising practices. If we were prepared to assume in the case at bar that Sofamor Danek's merchandising practices constituted material information for purposes of the federal securities laws, however, that in itself would not be dispositive of the question whether disclosure was required. Materiality alone is not sufficient to place a company under a duty of disclosure. See *Philip Morris*, 75 F.3d at 808. See also *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir.1987).

The plaintiffs point to three circumstances that gave rise, in their submission, to a duty to disclose the allegedly illegal promotion of Sofamor Danek's products and the allegedly excessive prices charged for items selected from loaner kits. First, the plaintiffs argue that the defendants advised the public of record revenues and earnings in statements that were incomplete and misleading because they attributed the company's success to such things as increased sales volume without properly explaining how the sales were being achieved. Second, the plaintiffs argue that Item 303(a)(3)(ii) of SEC Regulation S–K, 17 C.F.R. § 229.303(a)(3)(ii), obligated the defendants to disclose the company's allegedly problematical marketing practices in the portion of the company's periodic SEC filings devoted to "[m]anagement's discussion and analysis of financial condition and results of

---

1. The case was decided shortly before enactment of the Private Securities Litigation Reform Act of 1995, which is codified at 15 U.S.C. § 78u–78u–

5. The Reform Act has no direct application here.

operations." Third, the plaintiffs argue that disclosure was required by reason of the substantial sales of Sofamor Danek stock made by a number of the company's officers and directors between November of 1993 and February of 1994. We shall discuss these arguments in turn.

### A

During the "Class Period"—defined in the complaint as the period from February 8, 1993, through April 21, 1994—the company reported a series of substantial increases in sales, coupled with increases in earnings for most, but not all, of the quarterly periods involved. In explaining the reasons for these increases, as the complaint notes, the company pointed to growth in the number of spinal implant operations being performed, increased demand for the company's products for use in these operations, favorable shifts in the sales mix, "leveraging" of fixed manufacturing costs and general administrative expenses, improved manufacturing efficiencies, an increase in prices for selected spinal systems, the introduction of new products, and expanded international sales. "These statements and reports created the impression that SDG's [Sofamor Danek Group's] tremendous growth in revenues and earnings was due to an increase in legitimate unit sales of SDG's products," the complaint avers. "Defendants were aware this was not the case," the complaint continues, and "were aware during the Class Period that much of SDG's sales success had been due to SDG's illicit promotion of its products for use in the pedicle area of the spine." Moreover, the complaint alleges, "defendants disavowed any

knowledge of wrongful promotion of pedicle screws,"[2] and they "downplayed any positive financial effects from loaner sales."

The sales and earnings data publicly reported by Sofamor Danek during the Class Period are "hard" numbers, the accuracy of which has never been challenged by the plaintiffs.[3] Neither have the plaintiffs pointed to any affirmative misstatement in the company's explanations of the numbers. Thus we must take it as true that more spinal implant procedures were being performed, that demand for the company's products was increasing, that favorable shifts in the sales mix were occurring, that fixed costs were being spread over an increased number of units, that manufacturing efficiencies were being achieved, that the company had raised certain prices, that new product lines were being sold, and that international sales were expanding.

The proposition that the company was engaging in illegal promotion of its products when it helped fund the Spinal Science Advancement Foundation and allowed its sales representatives ("independent commission sales representatives," according to the 10–K forms) to attend operations where surgeons made attachments to the pedicle is not a proposition that can fairly be said to fall in the category of "hard" information. Hard information "is typically historical information or other factual information that is objectively verifiable...." *Garcia v. Cordova,* 930 F.2d 826, 830 (10th Cir.1991). Such information is to be contrasted with "soft" information, which includes predictions and matters of opinion. See *Lewis v. Chrysler*

---

2. The only example of such disavowal cited in the complaint was the conference call with stock analysts on October 20, 1993, when the company's president allegedly downplayed the FDA's August warning letter and "stated that SDG would continue to comply with the FDA rules regarding medical education." On appeal, the plaintiffs also cite passages in the 10–K forms for 1992 and 1993 where the company said that it could not predict the use of products for applications not approved by the FDA and did not encourage such use. The defendants maintain that the plaintiffs may not rely on 10–K material to which there was no express reference in the complaint. These public filings were made part of the record by the defendants, however, and the passages in question are consistent with the

complaint's allegation that the defendants disavowed any knowledge of wrongful promotion. We agree with the plaintiffs that the Form 10–K material may be taken into consideration here.

3. It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data. See *In re Convergent Technologies Sec. Litig.,* 948 F.2d 507, 512–13 (9th Cir.1991). The disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future. See *In re VeriFone Sec. Litig.,* 784 F.Supp. 1471, 1484–85 (N.D.Cal. 1992), *aff'd,* 11 F.3d 865 (9th Cir.1993).

*Corp.,* 949 F.2d 644, 652 (3d Cir.1991). The legality of Sofamor Danek's support for the non-profit foundation, for example, was a matter of opinion—"soft information." And *"our cases firmly establish the rule that soft information . . . must be disclosed only if . . . virtually as certain as hard facts." Starkman v. Marathon Oil Co.,* 772 F.2d 231, 241 (6th Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986).

As we have seen, Sofamor Danek did disclose its receipt of the warning letter from the FDA regarding the company's support for medical programs demonstrating the use of screws in the pedicle. In discussions with stock analysts, it is true, the company "downplayed" the significance of the warning letter—but any analyst could easily obtain a copy of the letter and could make an independent judgment of its significance. Each of the company's 10–K forms explicitly mentioned the risk that the FDA might obtain an injunction against any distribution of the Bone Plate and Screw Product Line—and if regulatory action had actually been initiated against the company, we have no reason to suppose that it would not have been reported.

The hard fact is that no regulatory action was initiated during the Class Period. And as far as we have been advised, none has been initiated to date. If the company had publicly opined that its support of the non-profit foundation was illegal, and if it had publicly predicted that the FDA would move against the company, the opinion would have come to look increasingly questionable with the passage of time, and the prediction would have proved to be flatly erroneous. This illustrates, we think, why predictions not "substantially certain to hold," like most matters of opinion, simply do not come within the duty of disclosure. See *Starkman,* 772 F.2d at 241.

By the same token, we see nothing in the company's public statements which gave rise to a duty to disclose more than was disclosed about the loaner kit program. At the very outset of its life as a publicly traded corporation, Danek stated publicly that hospitals were charged premium prices for loaner kit components not returned to the company. It

was Danek that bore the cost of carrying loaner kits in inventory and Danek that bore the risk of obsolescence—so the charging of a premium for loaner kit components that the hospitals ultimately decided to use was hardly surprising. Whether the premium was so high that the company should have been able to predict that it would prove counterproductive was clearly a matter of opinion—soft information as to which there was no duty of disclosure.

### B

Item 303(a)(3)(ii) of SEC Regulation S–K, 17 C.F.R. § 229.303(a)(3)(ii)—an item that pertains to "[m]anagement's discussion and analysis of financial condition and results of operations" for full fiscal years—obligates reporting companies to:

> "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed."

Instruction seven for this item draws a distinction between "forward-looking information," which need not be disclosed, and "presently known data which *will* impact upon future operating results, such as *known* future increases in costs of labor or materials." (Emphasis supplied.) Sofamor Danek could have had no way of knowing with the degree of assurance implied by the instruction that the merchandising practices in question would have a material adverse impact upon future operating results, and we do not read the plaintiffs' complaint as alleging facts sufficient to show a violation of Item 303. Indeed, Item 303 is not even cited in *the complaint.*

The defendants invite our attention, moreover, to several cases in which federal district courts have held that there is no private right of action under Item 303. See *In re*

*Cypress Semiconductor Sec. Litig.,* [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,060 (N.D. Cal. Sept. 23, 1992); *In re VeriFone Sec. Litig.,* 784 F.Supp. 1471 (N.D.Cal.1992), *aff'd,* 11 F.3d 865 (9th Cir. 1993); *Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598, 608 (N.D.Cal.1991). The plaintiffs, in response, acknowledge that the courts have been reluctant to recognize a private right of action under Item 303. The plaintiffs suggest, however, that the absence of a separate cause of action "does not preclude plaintiffs from arguing ... that defendants' disclosure duty under the Rule 10b–5 claim may stem from Item 303." Perhaps so—but for reasons similar to those explained above, we do not find the argument persuasive.

### C

■ Finally, the plaintiffs contend that the individual defendants' "massive insider trading" created a duty to disclose that pedicular use of Sofamor Danek products was being promoted illegally, through the nonprofit foundation and otherwise, and that the company was charging unsustainable premiums for items sold from its loaner kits. Again we are not persuaded.

■ The plaintiffs have not asserted an explicit insider trading claim, as they acknowledge in their opening brief on appeal. Noting that "plaintiffs have not brought an insider trading claim against the defendants," District Judge Turner "decline[d] to accept plaintiffs' argument that the allegations of insider trading create a duty that is transferrable to the securities fraud claim against the corporate defendant or the individual defendants." In this connection the court cited *In re Seagate Technology II Sec. Litig.,* 843 F.Supp. 1341, 1369 (N.D.Cal.1994) (recognizing that "importing this duty to disclose" would result in potentially "enormous liability on insider traders—liability that could not anticipated by Congress").

*Seagate* seems correct to us. As explained in an article entitled "Insider Stock Sales in Rule 10B–5 Corporate Disclosure Cases,"

> "*Seagate* provides a persuasive analysis. In addition to the enormous potential liability that selling insiders could face, the plaintiffs' theory in *Seagate* would eviscerate limitations on a corporation's duty to disclose information because there nearly always are some insiders selling stock in a given time period. Thus, corporations would be under a duty to disclose all information even colorably material, or face potential second-guessing in a subsequent disclosure suit. Such a rule would deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public." Jordan Eth & Michael Dicke, 1 Stan. J.L. Bus. & Fin. 97, 109 (1994) (footnote omitted).

### IV

■ In addition to asserting federal securities fraud claims, the plaintiffs' complaint sets forth claims for fraud and negligent misrepresentation under the law of Tennessee. The district court recognized, and the parties do not dispute, that reliance is an element of these common law claims. *Cf. Edwards v. Travelers Insurance of Hartford, Conn.,* 563 F.2d 105, 113 (6th Cir.1977). The district court also recognized, and the parties likewise do not dispute on appeal, that the plaintiffs' complaint does not assert direct reliance by the plaintiffs on the alleged misrepresentations; rather, the complaint rests on a fraud-on-the-market theory.

Neither the courts of Tennessee nor federal courts applying Tennessee law have held that the fraud-on-the-market theory is enough to satisfy the reliance requirement for common law purposes. On the other hand, the theory has not been expressly rejected by the Supreme Court of Tennessee. In the absence of a state supreme court decision on the issue, we must do our best to predict whether the Supreme Court would require actual reliance before allowing recovery for common law fraud and negligent misrepresentation in Tennessee. See *Bailey Farms, Inc. v. NOR–AM Chemical Co.,* 27 F.3d 188, 191 (6th Cir.1994) ("[t]o the extent that the state supreme court had not yet addressed the issue presented, it is our duty to anticipate how that court would rule") (citing *Mahne v. Ford Motor Co.,* 900 F.2d

83, 87 (6th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 349, 112 L.Ed.2d 313 (1990)).

We believe the Tennessee Supreme Court, if faced with the facts of the plaintiffs' case, would require a showing of actual reliance as a condition of recovery for common law fraud or negligent misrepresentation. Tennessee's intermediate appellate courts have uniformly held that fraudulent misrepresentation must be established by proof that the defendant actually relied on the plaintiff's representations. See *Edwards v. Bruce,* 1996 WL 383294, at *8 (Tenn.Ct.App. July 10, 1996) (an element of fraudulent misrepresentation is that "the plaintiff actually relied on the misrepresentation of the material fact"); *Edmondson v. Coates,* 1992 WL 108717, at *15 n. 1 (Tenn.Ct.App. May 22, 1992) (one element of fraudulent misrepresentation is "reasonable reliance," which means actual reliance). We have no reason to suppose that the Tennessee Supreme Court would hold otherwise in a context of the sort presented here.

With respect to negligent misrepresentation, Tennessee follows the Restatement (Second) of Torts, § 552 (1977). See *Ritter v. Custom Chemicides, Inc.,* 912 S.W.2d 128, 129 (1995). The majority of federal courts considering the question have held that § 522 of the Restatement requires actual reliance before a party may be held liable for negligent misrepresentation. See *Smolen v. Deloitte, Haskins & Sells,* 921 F.2d 959, 964 (9th Cir.1990) (under § 552 "negligent misrepresentation requires actual and justifiable reliance"); *In re Westinghouse Sec. Litig.,* 832 F.Supp. 948, 989 (W.D.Pa.1993) (the "fraud on the market theory has never been made applicable to a common law claim of negligent misrepresentation ..."); *Goldman Services Mechanical Contracting, Inc. v. Citizens Bank and Trust Co. of Paducah,* 812 F.Supp. 738, 742 (W.D.Ky.1992) (the "Restatement and its comments make clear that actual reliance on the information by the person for whom it was intended is required for liability for a negligent misrepresentation"). We think the Tennessee Supreme Court would follow the majority rule.

Setting aside the issue of actual reliance, the plaintiffs in the case at bar argue that they are entitled to a "presumption of reliance." In this connection the plaintiffs cite *Memphis Housing Auth. v. Paine, Webber, Jackson & Curtis, Inc.,* 639 F.Supp. 108, 113 (W.D.Tenn.1986).

In *Memphis Housing,* a decision not to enter summary judgment for a defendant charged with securities fraud was based in part on the ground that the " 'obligation to disclose and [the] withholding of a material fact establish the requisite element of causation in fact.' " *Id.* (quoting *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972)). But in *Memphis Housing* a duty to disclose had arisen under the federal securities laws. No corresponding duty exists under federal law in the case at bar. *Memphis Housing* is thus inapplicable here.

For the reasons stated above, and for substantially all of the reasons given by Judge Turner, the judgment entered by the district court is **AFFIRMED.**