Billy **CUPP** and Cathy R. Craig d/b/a Looks Salon, Plaintiff,

v.

**ALBERTO–CULVER USA, INC.,** Sally Beauty Company, Inc., Beauty Systems Group, Inc., L'Oréal, S.A., L'Oréal USA, Inc., Redken 5th Avenue N.Y.C. LLC, and John Paul Mitchell Systems, Defendants.

No. 03–2592–DV.

United States District Court, W.D. Tennessee, Western Division.

March 30, 2004.

Billy J. Cupp, Cordova, TN, pro se.

Cathy R. Craig, Cordova, TN, pro se.

James H. Stock, Jr., Weintraub Stock & Grisham, Memphis, TN, Melvin A. Schwarz, Washington, DC, J. Brook Lathram, W.J. Michael Cody, Douglas F. Halijan, Burch Porter & Johnson, Memphis, TN, Ronald M. Harkavy, Henry C. Shelton, III, Armstrong Allen, PLLC, Memphis, TN, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO ENJOIN ACQUISITIONS**

DONALD, District Judge.

Before the Court are (1) the motion to dismiss of Alberto–Culver USA, Inc. ("Alberto–Culver"), Sally Beauty Company, Inc. ("SBC"), and Beauty Systems Group, Inc. ("BSG") (collectively "Alberto–Culver Defendants"); (2) the motion to dismiss of L'Oréal USA, Inc. ("L'Oréal USA") and Redken 5th Avenue N.Y.C. LLC ("Redken") (collectively "L'Oréal Defendants"); (3) the motion to dismiss of John Paul Mitchell Systems ("Paul Mitchell"); (4) the motion for summary judgment of Billy J. Cupp ("Cupp") and Cathy R. Craig ("Craig") d/b/a/ Looks Salon ("Plaintiff"); and (5) Plaintiff's motion to enjoin acquisitions. Finding that Plaintiff failed to state a claim on which relief may be granted, the Court grants Defendants' motions to dismiss. Accordingly, the Court denies Plaintiff's motion for summary judgment and denies Plaintiff's motion to enjoin acquisitions.

## I. Factual Background[1]

Alberto–Culver manufactures, distributes, and markets beauty care products in the United States and internationally. Alberto–Culver's principal brands include Alberto VO5, St. Ives, TRESemme, TCB, Soft and Beautiful, Just for Men, Consort, and Motions. SBC is a subsidiary of Alberto–Culver that markets professional beauty care products, with 2761 stores and over one thousand professional sales consultants. BSG is operated by SBC and sells professional beauty care products to salon owners and salon professionals in exclusive geographic territories. The products that it sells include Redken, Matrix, Paul Mitchell, Graham Webb, and Sebastian.

L'Oréal USA is a wholly-owned subsidiary of L'Oréal S.A., a French corporation.[2] L'Oréal USA is a Delaware corporation, with its headquarters in New York. Redken is a wholly-owned subsidiary of L'Oréal USA.

Paul Mitchell produces approximately ninety products, which are sold through distributors within the United States and other countries to more than 110,000 hair salons worldwide. Paul Mitchell manufactures its hair and skin care products in the United States.

Plaintiff is a full-service hair salon for men and women located in Cordova, Tennessee. Plaintiff offers styling services and hair care products for clients and customers.

From April 2000 until September 2002, Plaintiff bought "exclusive salon hair care products," which it defines as hair care products sold exclusively through salons under the advice of professional hair stylists, from two local distributors located in Memphis, Tennessee. Plaintiff obtained Paul Mitchell products from Heil Beauty Systems ("Heil"). Plaintiff obtained Redken products from Arnold's, Inc. ("Ar-

---

1. Under Federal Rule of Civil Procedure 12(b)(6), the Court takes the facts from Plaintiff's complaint and from the materials submitted on these motions to dismiss. In addition, because Plaintiff's response to Defendants' motions to dismiss argues only by referring to its summary judgment motion, the Court will refer to the summary judg-

ment papers as necessary. This does not, however, convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment, as the Court's holding rests on Plaintiff's failure initially to state a claim.

2. The Court dismissed L'Oréal S.A. for lack of personal jurisdiction on March 17, 2004.

nold's"). Another local distributor, State Beauty Supply, also carried Redken products but would not sell Plaintiff the products needed to support Plaintiff's retail market.

BSG acquired Heil in 1999, and it therefore began distributing Paul Mitchell products. BSG acquired Arnold's in September 2002, and it therefore began distributing Redken products.

In April 2003, BSG, without warning or notice, stopped all Plaintiff's product orders and would not restart them unless and until Cupp and Craig signed an agreement regarding distribution of products sold to Plaintiff by BSG ("Agreement"). The Agreement stated several requirements that salon professionals had to fulfill to purchase products from BSG; these requirements included restrictions on where the products could be used and how they could be resold and prohibitions on changing various tracking codes on the products. The Agreement referred to several manufacturers [3] as third party beneficiaries of the Agreement, with independent rights to enforce the Agreement.

Cupp and Craig refused to sign the Agreement, and therefore their salon was unable to obtain hair care products through BSG. Plaintiff sustained severe economic losses as a result. Cupp wrote several letters to manufacturers and distributors expressing his concern over the situation, but BSG refused to proceed with sales to Plaintiff without the Agreement in force.

## II. Procedural Background

Plaintiff filed this complaint pro se on August 12, 2003. Plaintiff alleges that (1)

BSG's acquisition of Arnold's created an illegal vertical merger under § 7 of the Clayton Act, 15 U.S.C. § 18 (2004); (2) BSG's distribution of the Redken product line, through its acquisition of Arnold's, created an illegal horizontal merger under § 7 of the Clayton Act; (3) BSG's requirement of the Agreement constituted unlawful restraint of trade under § 1 of the Sherman Act, 15 U.S.C. § 1 (2004); (4) BSG's requirement of the Agreement constituted monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2 (2004); and (5) the Agreement is evidence of express collusion in violation of § 1 of the Sherman Act.

On November 20, 2003, Paul Mitchell filed a motion to dismiss, arguing that (1) Plaintiff failed to plead any allegations supporting personal jurisdiction over Paul Mitchell; (2) Plaintiff failed to make any allegations regarding proper venue; and (3) Plaintiff failed to state a claim against Paul Mitchell, who was not an active participant in any allegedly unlawful acts of which Plaintiff complained. Plaintiff filed a response on November 24, 2003, requesting that Paul Mitchell's motion be denied.

On December 19, 2003, the remaining Defendants filed two motions to dismiss. The L'Oréal Defendants argue that Plaintiff failed to state a claim on which relief can be granted because Plaintiff did not allege (1) a contract, combination, or conspiracy involving the L'Oréal Defendants, or any injury to competition, as required under § 1 of the Sherman Act; (2) monopoly power by the L'Oréal Defendants or a relevant market, as required under § 2 of the Sherman Act; or (3) any acquisition or

---

**3.** These manufacturers included: ARTec; Farouk Systems, Inc.; Graham Webb International; Innovative Styling Options, Inc.; Paul Mitchell; L'Oreal Professional; Matrix; Redken; Rusk, Inc.; SalonQuest, LLC; Sebastian International, Inc.; The Wella Corporation; TIGI Linea, Inc.; and "any additional BSG distributed brands that may be supplied in the future."

merger by the L'Oréal Defendants, as required under § 7 of the Clayton Act.

Second, the Alberto–Culver Defendants argue that Plaintiff failed to state a claim on which relief can be granted because (1) Plaintiff did not define properly the relevant market; (2) Plaintiff did not allege that the Alberto–Culver Defendants possess monopoly power in any relevant market; and (3) Plaintiff did not allege the existence of an unlawful agreement or any antitrust injury, as required for a claim under § 1 of the Sherman Act.

On January 12, 2004, Plaintiff filed a motion for summary judgment. Plaintiff argues that (1) BSG gained monopoly power through its acquisition of Arnold's, by reducing competition and eliminating other sources from which Plaintiff might obtain Redken and Paul Mitchell products in the relevant market; (2) this acquisition consolidated 100% of the market power in BSG, because the relevant market involves only Paul Mitchell and Redken products, the only lines for which Plaintiff had developed markets; (3) the requirement of the Agreement before further distribution was an unlawful restraint of trade; (4) Defendants acted in express collusion and as a cartel; and (5) many other antitrust violations are shown by the corporate relationships of Defendants. Plaintiff supplemented its motion, with leave of the Court, on February 4, 2004.

On January 23, 2004, Plaintiff responded to Defendants' motions to dismiss, referring to its motion for summary judgment as the basis for denying dismissal.

On February 19, 2004, the L'Oréal Defendants and the Alberto–Culver Defendants filed reply briefs in support of their motions to dismiss and in opposition to Plaintiff's motion for summary judgment. On February 19, 2004, Paul Mitchell filed a notice of joinder in the Alberto–Culver Defendants' reply brief. All Defendants join in the arguments made by the other Defendants.

On November 28, 2003, Plaintiff filed a motion entitled "Motion to Enjoin Acquisitions." Plaintiff requests that the Court "immediately enjoin any and all pending acquisitions by the defendant as until [ ] such time as this case ... is resolved, in order to prevent any further violations and/ or [sic] the compounding of current illegal configurations and actions on the part of the Defendant." (Mot. to Enjoin Acquisitions at 1.) The L'Oréal Defendants responded on December 17, 2003, arguing that the Court should deny Plaintiff's motion for failure to (1) comply with the Local Rules or (2) provide any basis for the relief requested. The L'Oréal Defendants also request that costs and sanctions be imposed on Plaintiff. The Alberto–Culver Defendants responded to Plaintiff's motion on December 19, 2003, adopting the L'Oréal Defendants' arguments. Plaintiff replied on December 23, 2003, apologizing for its lack of compliance with the Local Rules.

### III. Rule 12(b)(6) Standard

A party may bring a motion to dismiss for failure to state a claim under Rule 12(b)(6). This motion tests only whether the plaintiff has pleaded a cognizable claim. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). Essentially, it allows the court to dismiss meritless cases which would otherwise waste judicial resources and result in unnecessary discovery. *See, e.g., Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

The Supreme Court has held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Neitzke,* 490 U.S. at 326–27, 109 S.Ct. 1827; *Lewis v. ACB Bus. Serv., Inc.,* 135 F.3d 389, 405 (6th Cir.1998). Thus, the standard to be applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion. *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). Even if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied.

To determine whether a motion to dismiss should be granted, the court must first examine the complaint. The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). In reviewing the complaint, the court must accept as true all factual allegations in the complaint and construe them in the light most favorable to the plaintiff. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983). Indeed, the facts as alleged by the plaintiff cannot be disbelieved by the court. *Neitzke,* 490 U.S. at 327, 109 S.Ct. 1827; *Murphy v. Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir.1997). Where there are conflicting interpretations of the facts, they must be construed in the plaintiff's favor. *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1039–40 (6th Cir.1991). However, legal conclusions or unwarranted factual inferences should not be accepted as true. *Lewis,* 135 F.3d at 405–06.

## IV. Analysis

### A. Relevant Market

 A plaintiff must first define the relevant market in order to state a claim under the antitrust statutes: § 1 of the Sherman Act, *Stratmore v. Goodbody,* 866 F.2d 189, 194 (6th Cir.1989) (stating that, in § 1 rule of reason[4] case, the "starting point ... is to identify the relevant product and geographic markets"); *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802, 805 (6th Cir.1988) (one element of a claim under § 1 is to show anticompetitive effects within relevant product and geographic markets); § 2 of the Sherman Act, *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768, 782 (6th Cir.2002) ("The first step in any action brought under § 2 of the Sherman Act is for the plaintiff to define the relevant product and geographic markets in which it competes with the alleged monopolizer ..."); and § 7 of the Clayton Act, *see Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 335, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (defining relevant market is necessary predicate to claim for unlawful vertical and horizontal mergers); *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957) ("[D]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition 'within the area of effective competition.' ") (quoting *Standard Oil Co. of Cal. v. United States,* 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949)). Determining the relevant market enables the court to assess whether the defendant has monopoly power in that market, what the area of competition is, and whether the allegedly unlawful acts have anticompetitive effects in that market. *See Brown Shoe,* 370 U.S. at 324, 82 S.Ct. 1502; *Grin-*

---

4. In contrast to certain antitrust claims that courts analyze with a rule of per se violation, courts assess vertical non-price restraints us-ing a rule of reason analysis. *See Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.,* 243 F.3d 980, 985 (6th Cir.2001).

*nell,* 384 U.S. at 571, 86 S.Ct. 1698; *E.I. du Pont,* 353 U.S. at 593, 77 S.Ct. 872.

■ The relevant market analysis includes both a product market and a geographic market. *Brown Shoe,* 370 U.S. at 324, 82 S.Ct. 1502. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* at 325, 82 S.Ct. 1502; *see also Grinnell,* 384 U.S. at 571, 86 S.Ct. 1698. According to the Sixth Circuit,

> The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendant's product or service ... reasonable interchangeability may be gauged by (1) the product uses, *i.e.,* whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service.

*White & White, Inc. v. Am. Hosp. Supply Corp.,* 723 F.2d 495, 500 (6th Cir.1983) (citation omitted) (court should consider product's uses, price, and physical characteristics in determining product market); *see also Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,* 185 F.3d 606, 622 (6th Cir.1999). A broad product market may contain several economically significant submarkets, which may constitute the relevant market for antitrust purposes. Factors for assessing the existence of a submarket are used in conjunction with the basic test of a product market to define more precisely the relevant market. *White & White,* 723 F.2d at 500. Unless a product is completely unique or exceptional market conditions exist, one brand in a

market of competing brands may not constitute the relevant market. *See Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.,* 12 F.3d 609, 614 (6th Cir.1993); *Seidenstein v. Nat'l Med. Enters., Inc.,* 769 F.2d 1100, 1106 (5th Cir.1985).

■ The court determines the geographic market by assessing the market area in which the seller operates and to which the buyer can practicably turn for supplies. *White & White,* 723 F.2d at 501.

■ Plaintiff's complaint fails to state a claim because it neglects to define a relevant market in any meaningful way. Plaintiff neglects entirely to define a geographic market. In the complaint, Plaintiff simultaneously mentions, without elaboration, both Defendants' international reach and its own inability to obtain Redken and Paul Mitchell products in the Memphis, Tennessee area, after BSG's acquisition of Arnold's. Similarly, Plaintiff states both that SBC is the "largest marketer of professional beauty care products in the world" and that BSG, SBC's subsidiary, sells beauty products in "exclusive geographic territories," which Plaintiff leaves unspecified. (Compl. at 2.) The disconnect between a strictly local or exclusive geographic area and some Defendants' global reach leaves the Court without any ability to formulate a relevant geographic market.

■ Furthermore, Plaintiff's attempted definition of the relevant product market is insufficient and fatally vague. *See Crane & Shovel,* 854 F.2d at 805 ("The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's 12(b)(6) motion."). In the complaint, Plaintiff refers to the relevant product market as "exclusive salon hair care products ... those sold exclusively through salons under the

advice of professional hair stylists."[5] (Compl. at 3.) First, Plaintiff offered no allegation of which hair care product brands are interchangeable with Defendants' products. From the face of the complaint, it is clear that many brands and suppliers of hair care products exist. Defendants themselves manufacture or distribute several product lines other than those purchased by Plaintiff or distributed by BSG. Plaintiff's motion papers also name several other companies, such as Procter & Gamble and Wella, that manufacture hair care products, without specifying how many other such companies or brands exist. Plaintiff even names one other distributor of hair care products in the Memphis area, State Beauty Supply, which carried Redken products. The Court would be skeptical of any claim that such other hair care products are not reasonably interchangeable with Defendants' products, given the conformity of uses among hair care products, or that other, unnamed distributors could not supply those other hair care products in suitable amounts for Plaintiff's use. Without a more specific definition and accounting of the brands and suppliers to be included in the relevant market, the Court cannot determine the boundaries of the market. It is thus unable to assess Defendants' market power, as discussed further below, which is one of the purposes of defining a relevant market.[6]

Second, given that Plaintiff named both retail (SBC) and salon (BSG) distributors of hair care products as Defendants, the Court is unsure why the product market should be limited only to those hair care products sold in salons. The interchangeability among retail and salon products of this type seems high, particularly given that the price of hair care products retailed directly to consumers is generally lower than those retailed through salons, thus providing readily available substitutes. If Plaintiff named SBC only because of its corporate relationship to BSG, that relationship, without more, is insufficient to implicate SBC in any allegedly unlawful actions of the other Defendants.

Third, the description "hair care products" is itself so vague that it leaves the Court at a loss as to what sorts of products to include. As the Alberto–Culver Defendants point out, those products could include shampoos, cosmetics, hair rinses, styling aids, or something more. Each

---

5. In its summary judgment motion, Plaintiff similarly describes the relevant market as "the products that belong to those marketed through hair salons known as 'professional hair care products', 'exclusive', or 'salon-line hair care retail lines' which have added market value as the result of the products' endorsement and use by licensed cosmetologists in licensed hair establishments." Plaintiff then goes on to state that only the two lines for which it had developed markets, Redken and Paul Mitchell, are material in this case. (Req. for Summ. J. at 3.) If Plaintiff is attempting to define the product market as composed of only the Redken or Paul Mitchell lines, this attempt fails, because no allegations show such complete uniqueness or exceptional market conditions as to justify restricting the relevant market to only two brands in the vast array of hair care products. The Court

construes the allegations more liberally, however, according to the Federal Rules of Civil Procedure and in deference to Plaintiff's pro se status. Fed.R.Civ.P. 8(f).

6. For example, Plaintiff states in its summary judgment motion that L'Oréal USA is the "# 1" professional hair care manufacturer, that SBC is the "# 2" retail hair care distributor, and that BSG is the "# 1" professional hair care distributor. Without any definition of the relevant market, the Court has no way to determine whether those Defendants actually are the market leaders. Also, "# 1" and "# 2" are such vague descriptors that the Court cannot assess whether those positions actually correspond to monopoly power, which Plaintiff must allege to state an antitrust claim.

category considered could expand the relevant market further, and Plaintiff's allegations do not indicate how broad the category is.

■ While the determination of a relevant market is generally a fact-based issue for the jury, *see Seidenstein,* 769 F.2d at 1106, the plaintiff must state adequate allegations to overcome a Rule 12(b)(6) motion to dismiss. When the complaint gives such a deficient proposal for a relevant market, it fails to state a civil antitrust complaint, and the Court may dismiss the case on that ground alone.

**B. Section One of the Sherman Act**

■ Plaintiff's complaint also fails because Plaintiff neglected to allege adequately several other essential elements of its antitrust claims. According to the Sixth Circuit, to establish a claim under § 1 of the Sherman Act,[7]

> "the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy."

*Crane & Shovel,* 854 F.2d at 805 (quoting *Davis–Watkins Co. v. Serv. Merch.,* 686 F.2d 1190, 1195–96 (6th Cir.1982) *abrogated on other grounds, Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). This statute therefore proscribes only concerted action, not independent action: "There

must be evidence that tends to exclude the possibility that the [defendants] were acting independently ... the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturers and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto,* 465 U.S. at 761, 764, 104 S.Ct. 1464 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980)).

Plaintiff's complaint fails on this element because Plaintiff did not sufficiently allege any concerted action by Defendants. First, while Plaintiff refers to the Agreement as "evidence of express collusion," (Compl. at 3.) the Court finds no such indication in the Complaint, because Plaintiff neglected to describe any provisions of the Agreement or to attach a copy of it. While a complainant need make only a short and plain statement of its claim, Fed.R.Civ.P. 8, conclusory statements are insufficient to survive a Rule 12(b)(6) motion. Therefore, simply stating that Defendants colluded, without specifying the nature of such collusion, does not satisfy the § 1 requirement that Plaintiff allege concerted action.

■ Second, Plaintiff may have attempted to claim that, when BSG made the Agreement a requirement for distribution, that action was the concerted effort of BSG and its parent companies, SBC and Alberto–Culver. Plaintiff, however, mentions absolutely no action by either SBC or Alberto–Culver regarding either the Agreement or anything at all; rather, from the complaint, it appears that only

**7.**
> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who

> shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony ...
> 15 U.S.C. § 1 (2004).

BSG and Plaintiff had any interaction concerning the Agreement. The Court declines to presume that a parent company participates in every decision or action of its subsidiary. *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir.1999) (declining to hold that a subsidiary and its parent can be considered a single entity for all § 1 purposes, without some specific evidence of coordinated activity). Also, "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). This is so because they have a complete unity of interest. *Id.* It is unclear from the complaint whether SBC owns BSG in whole or in part, or whether Alberto–Culver owns SBC in whole or in part, however, if these are wholly owned subsidiaries, then to the extent that any coordination might have been alleged, it does not qualify as concerted activity for § 1 purposes.

Similarly, there is no allegation in the complaint indicating that L'Oréal USA, Redken, or Paul Mitchell were at all involved in BSG's issuance of the Agreement. As far as the Court can interpret from the complaint, the only connection between these three Defendants and the Alberto–Culver Defendants is that BSG distributed products made by L'Oréal USA, Redken, and Paul Mitchell. Standing alone, the fact of distribution by BSG indicates nothing in connection with the Agreement. Nor does the complaint allege any other actions by these three Defendants that could implicate them in any conspiracy or combination with the Alberto–Culver Defendants. In fact, the only mention of Paul Mitchell at all in the complaint is that BSG distributed Paul Mitchell products. This allegation in no way indicates any concerted action.

Third, although generally on a Rule 12(b)(6) motion, the Court examines only the complaint to determine whether the plaintiff stated a claim, with deference to Plaintiff's pro se status, the Court will consider the Agreement, as attached to Plaintiff's summary judgment motion. Two portions of the Agreement involve parties other than BSG and the salon professional required to sign the Agreement: (1) the statement that BSG has agreements, with which it intends to comply, with many manufacturers limiting the sale of their products to salons and professionals in the field; and (2) the above-mentioned list of some manufacturers, which are third party beneficiaries of the Agreement, with independent rights to enforce the Agreement. (Req. for Summ. J., Ex. D.) The Court does not consider those brief references to other parties to suffice as allegations of concerted action. The references indicate only that BSG, a distributor, deals with other companies, namely manufacturers, with whom it maintains agreements. Furthermore, Plaintiff states throughout its submitted documents that it does not contest the right of BSG to enforce such a requirement, nor does Plaintiff provide a reason for its refusal to sign the Agreement. (*See, e.g.*, Compl. at 3.) Indeed, BSG may independently refuse to deal with Plaintiff for almost any reason; only if there was a sufficient allegation of concerted action could this refusal to deal potentially become unlawful. *See Monsanto*, 465 U.S. at 761, 104 S.Ct. 1464.

In summary, Plaintiff's complaint fails to allege concerted action by Defendants in any combination, conspiracy, or contract. In fact, the only actions that the Court can discern from the complaint involve BSG acting independently, either through its acquisitions of Heil and Arnold's or through its insistence that Plaintiff sign the Agreement. Plaintiff appears to have

mentioned the other Defendants only because of their corporate relationship to BSG (Alberto–Culver and SBC), or because their products were ones previously acquired by Plaintiff through BSG (L'Oréal USA, Redken, and Paul Mitchell). The fact that Plaintiff chose to buy Paul Mitchell and Redken products from BSG does not implicate Paul Mitchell or the L'Oréal Defendants in any of BSG's actions. Nor does the mere existence of a corporate relationship implicate a parent in its subsidiary's actions. Plaintiff's conclusory statements that Defendants colluded are insufficient to survive this 12(b)(6) motion to dismiss.

## C. Section Two of the Sherman Act

The offense of monopoly under § 2 of the Sherman Act [8] has two elements: "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. 1698; *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir.1999). Monopoly power is " 'the power to control prices or exclude competition,' " which may ordinarily "be inferred from the predominant share of the market." *Grinnell*, 384 U.S. at 571, 86 S.Ct. 1698 (noting that cases in which the Court previously found monopoly power involved defendants possessing over two-thirds, 80%, or 90% of the relevant market) (quoting *E.I. du Pont*, 351 U.S. at 391, 76 S.Ct. 994). Thus, an essential element of a § 2 claim is proving that the defendant possessed monopoly power,

which is itself a function of the definition of a relevant market.

Plaintiff's complaint states succinctly, "[t]he requirement of the product agreement violated Section 2 of the Sherman Act as it was an *exclusionary device*, used to leverage the *existing position of monopoly power* created by the Arnold's acquisition." (Compl. at 3 (emphasis in original)). The Court can only guess as to which Defendant this statement refers. Regardless, as stated above, conclusory allegations such as this are insufficient to survive a Rule 12(b)(6) motion to dismiss.

Plaintiff's complaint is also devoid of any allegations that any of the Defendants had the power to control prices or output.

Furthermore, Plaintiff's complaint fails to allege monopoly power because it does not allege any predominant market share by any of the Defendants and because it fails to define the relevant market adequately. Plaintiff's only non-conclusory references to the power wielded by Defendants are in such vague terms as "largest," "# 1," and "# 2" (these numerical figures appear only in the summary judgment motion, not in the complaint). "Largest" is simply too vague a descriptor, as it could mean any percentage of a market, requiring only that all competitors be smaller. In other words, if the "largest" market player owned only 10% of the market, with many other competitors owning even smaller percentages of the market, that 10% would not equate to monopoly power. Plaintiff does not allege that any Defendant had any specific, let alone predominant, share of the market. Also, without

---

8. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felo- ny ..." 15 U.S.C. § 2 (2004). Section 2 therefore also prohibits attempts to monopolize and conspiracies to monopolize, but Plaintiff's complaint appears to allege only the offense of monopolization.

knowing the boundaries of the relevant market, whether or not Defendants maintained monopoly power also cannot be known. Even if Plaintiff had provided more descriptive assessments of Defendants' holdings, the percentage of the market that those holdings comprise is unknowable without an adequate allegation of the market. *See Grinnell,* 384 U.S. at 594, 86 S.Ct. 1698. Plaintiff's complaint therefore fails to state that any Defendant possessed monopoly power, in whatever relevant market might apply here. Plaintiff thus fails to state a claim under § 2 of the Sherman Act.

### D. Section Seven of the Clayton Act

 Section 7 of the Clayton Act[9] is designed to reach acquisitions by a corporation of all or any part of the stock or assets of another corporation, competitor or not, "whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce." *E.I. du Pont,* 353 U.S. at 592, 77 S.Ct. 872; *see also Brown Shoe,* 370 U.S. at 316, 82 S.Ct. 1502.

 The only acquisitions alleged in Plaintiff's complaint are those by BSG of Heil and Arnold's. Clearly, then, Plaintiff's complaint fails to state a § 7 claim as to all Defendants other than BSG, because without acquiring any stock or assets of another company, those Defendants cannot be liable under § 7. Having a company distribute a product does not result in that company acquiring assets of the corporation that manufactures that product.

 As to BSG, Plaintiff did allege that BSG's acquisition of Arnold's, subsequent to its acquisition of Heil, resulted in an unreasonable restraint of trade by eliminating competing distributors within the local area and causing competing brands to be distributed through only one distributor. This restriction on competition might have been a sufficient § 7 allegation to survive the Rule 12(b)(6) motion had Plaintiff made the necessary allegations of a relevant market. *E.I. du Pont,* 353 U.S. at 593, 77 S.Ct. 872 (determination of a relevant market is a "necessary predicate" to a finding of a § 7 violation). Without those initial allegations, however, Plaintiff's complaint fails to state a claim on the Clayton Act count as well.

## V. Conclusion

The Court finds that Plaintiff failed to allege adequately a relevant market and therefore fails to state a claim under the antitrust statutes. The Court also finds that Plaintiff failed to allege concerted action among Defendants, the possession of monopoly power by any Defendant, or the acquisition of stock of another corporation by any Defendant other than BSG. The Court therefore **GRANTS** Defendants' motions to dismiss. Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment and **DENIES** Plaintiff's motion to enjoin acquisitions. The Court, in its discretion and with attention to Plaintiff's pro se status, also **DENIES** Defendants' request for costs or sanctions.

9.
 No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of anoth-er person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly . . .
15 U.S.C. § 18 (2004).

IT IS SO ORDERED this ⎯⎯ day of ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯, 2004.