Sykes v. Blue Cross & Blue Shield of N.C., 2018 NCBC 29.

STATE OF NORTH CAROLINA

COUNTY OF FORSYTH

SUSAN SYKES d/b/a ADVANCED
CHIROPRACTIC AND HEALTH
CENTER; DAWN PATRICK; TROY
LYNN; LIFEWORKS ON LAKE
NORMAN, PLLC; BRENT BOST; and
BOST CHIROPRACTIC CLINIC, P.A.,

Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF
NORTH CAROLINA; CIGNA
HEALTHCARE OF NORTH
CAROLINA, INC.; and MEDCOST,
LLC.

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 3136

**ORDER & OPINION ON
DEFENDANTS' MOTIONS
TO DISMISS**

1.      THIS MATTER is before the Court on (1) Defendant Blue Cross's Motion to Dismiss ("Blue Cross's Motion"), (2) Cigna Healthcare of North Carolina, Inc.'s Motion to Dismiss ("Cigna's Motion"), and (3) MedCost's Motion to Dismiss ("MedCost's Motion") (collectively, the "Motions").  For the reasons discussed below, the Court GRANTS the Motions.

*Oak City Law LLP, by Robert E. Fields III and Samuel Piñero II, Craige Jenkins Liipfert & Walker LLP, by Ellis B. Drew III and Leon E. Porter, and Doughton Blancato PLLC, by William A. Blancato, for Plaintiffs.*

*Kilpatrick Townsend & Stockton LLP, by Chad D. Hansen, Elizabeth L. Winters, Peter M. Boyle (pro hac vice), and Christina E. Fahmy (pro hac vice), for Defendant Blue Cross and Blue Shield of North Carolina.*

*Smith Moore Leatherwood LLP, by D. Erik Albright, and Kirkland & Ellis LLP, by Joshua B. Simon (pro hac vice), Warren Haskel (pro hac*

*vice), and Dmitriy Tishyevich (pro hac vice), for Defendant Cigna Healthcare of North Carolina, Inc.*

*Ellis & Winters LLP, by Stephen D. Feldman, for Defendant MedCost, LLC.*

Gale, Chief Judge.

## I. INTRODUCTION

2. This case is one of two putative class actions by four North Carolina-licensed chiropractors ("Plaintiffs") who allege that Blue Cross and Blue Shield of North Carolina ("Blue Cross"), Cigna Healthcare of North Carolina, Inc. ("Cigna"), MedCost, LLC ("MedCost") (collectively, "Defendants" or "Insurers") contract with Health Network Solutions ("HNS") to provide or restrict insured chiropractic services in violation of North Carolina's insurance and antitrust laws.

3. In the first action filed in April 2013, *Sykes v. Health Network Solutions, Inc.*, No. 13 CVS 2595 ("*Sykes I*"), Plaintiffs sued only HNS and its individual owners. In ruling on an initial motion to dismiss, the Court allowed limited discovery necessary to define the relevant market against which Plaintiffs' claims must be measured. With the benefit of that discovery, Plaintiffs in May 2015 brought this action ("*Sykes II*").

4. The factual allegations of the complaints in both actions are essentially the same, and both cases present the same antitrust claims and theories. Plaintiffs elected to bring two independent actions rather than moving to amend the *Sykes I* complaint to add the Insurers. The Court has deferred a motion to consolidate the cases.

5. Plaintiffs' central allegation is that Blue Cross, Cigna, MedCost, and Healthgram, Inc. ("Healthgram") agreed to obtain chiropractic services exclusively from HNS to unlawfully restrict the output of medically necessary chiropractic services. In each complaint, Plaintiffs alleged four separate markets, the narrowest being limited to in-network insured chiropractic services and the broadest being the market for all chiropractic services in North Carolina ("North Carolina Market"). In *Skyes I*, the Court held that the only adequate, legally cognizable market Plaintiffs alleged was the North Carolina Market. *Sykes v. Health Network Sols., Inc.*, No. 13 CVS 2595, 2017 NCBC LEXIS 73 at *39 (N.C. Super. Ct. Aug. 18, 2017). In that same Order & Opinion, the Court deferred ruling on whether Plaintiffs adequately allege that any Defendant has market power in the North Carolina Market and requested supplemental briefing on that issue in both cases. *Id.* at *64; (Order Requesting Suppl. Br., ECF No. 65.)

6. Because the essential factual allegations in the two actions are the same, the Court appropriately incorporates and applies its rulings and reasoning in *Sykes I* when resolving the Motions in this case. The Court today issues a separate Order & Opinion in *Sykes I*, dismissing all claims in that action. The Court now rules that the claims in this action must also be dismissed because Plaintiffs have failed to allege Defendants' market power in the North Carolina Market.

## II. PROCEDURAL HISTORY

7. Plaintiffs filed their complaint ("Complaint") in this case on May 26, 2015. The case was designated as a mandatory complex business case on June 2, 2015, and assigned to the undersigned on June 3, 2015.

8. On September 25, 2015, Blue Cross, Cigna, and MedCost filed the Motions, and HNS renewed its motion to dismiss in *Sykes I*.

9. On August 18, 2017, the Court issued its Order & Opinion in *Sykes I*, determining that Plaintiffs' claims must be judged against the North Carolina Market and that the three more narrow markets Plaintiffs proposed were not legally cognizable. *Sykes I*, 2017 NCBC LEXIS 73, at *71. As the market allegations are essentially identical in both cases, the Court's ruling in *Sykes I* concerning the North Carolina Market also controls any antitrust claims in this action.

10. On September 11, 2017, Plaintiffs dismissed their claims against Healthgram pursuant to Rule 41(a)(1), thereby mooting an earlier request for Court approval of a settlement agreement between Plaintiffs and Healthgram that Blue Cross, Cigna, MedCost, and HNS—who was allowed to intervene for the limited purpose of opposing the settlement—opposed.

11. On October 2, 2017, Blue Cross, Cigna, MedCost, and Plaintiffs each submitted supplemental briefing on the issue of Plaintiffs' pleading of market power in the North Carolina Market. On October 23, 2017, Plaintiffs submitted a response brief, and Defendants submitted a joint response brief.

12. Pursuant to Rule 7.4 of the General Rules of Practice and Procedure for the North Carolina Business Court, the Court elects to rule on the Motions without additional oral argument. The Motions are ripe for resolution.

## III. FACTUAL BACKGROUND

13. The Court provided extensive factual background in its Order & Opinion in *Sykes I*, 2017 NCBC LEXIS 73 at *6–13, and here includes only factual information pertinent to the Motions. The Court accepts Plaintiffs' factual allegations as true and makes any permissible inferences favorable to them, but is not bound by legal conclusions unsupported by underlying factual allegations.

## A. The Parties

### (1) The Plaintiffs

14. The named Plaintiffs in this lawsuit are four licensed North Carolina chiropractors and their affiliated practices. (Compl. ¶¶ 3–6, ECF No. 1.)

15. Susan Sykes practices chiropractic in Forsyth County, North Carolina, where she does business as Advanced Chiropractic and Health Center. (Compl. ¶ 3.)

16. Dawn Patrick practiced chiropractic in Iredell County, North Carolina, at Lifeworks on Lake Norman, PLLC, a North Carolina professional limited liability company of which she is part owner. (Compl. ¶ 4.)

17. Troy Lynn practices chiropractic in Iredell County, North Carolina, at Lifeworks on Lake Norman, PLLC. (Compl. ¶ 5.)

18.     Brent Bost practices chiropractic in Rowan County, North Carolina, at Bost Chiropractic Clinic, P.A., a North Carolina professional association that he owns.  (Compl. ¶ 6.)

19.     The named Plaintiffs seek to represent a class consisting of "all licensed chiropractors practicing in North Carolina from 2005 to the present who provided services in the North Carolina Market."  (Compl. ¶ 46.)  Plaintiffs allege that each class member was either excluded from in-network access to Defendants' patients, charged fees and subjected to HNS's review process, or both.  (Compl. ¶ 48.)

**(2)     The Defendants**

20.     Blue Cross is a North Carolina corporation with a principal place of business in Durham County, North Carolina.  (Compl. ¶ 7.)  Blue Cross is licensed as a medical service corporation by the North Carolina Department of Insurance and is alleged to control 50% or more of the private health-insurance market in North Carolina.  (Compl. ¶ 7.)

21.     Cigna is a North Carolina corporation with a principal place of business in Wake County, North Carolina, and is licensed as a health maintenance organization by the North Carolina Department of Insurance.  (Compl. ¶ 8.)

22.     MedCost is a North Carolina limited liability company with a principal place of business in Forsyth County, North Carolina.  (Compl. ¶ 9.)  MedCost is a third-party administrator.  (Compl. ¶ 9.)

**B.     HNS's Business Structure**

23.     HNS is an "integrated independent practice association," consisting of approximately 1,000 of North Carolina's approximately 2,000 active chiropractors. (Compl. ¶¶ 27–28, 56–57.)  Chiropractors enroll in HNS by agreeing to provide in-network care to patients covered by Defendants, with whom HNS has entered into exclusive agreements to provide in-network care. (Compl. ¶ 28.)  Plaintiffs allege that for chiropractors to be in-network providers for Defendants and obtain in-network access to patients, "they must go through HNS."  (Compl. ¶ 31.)  Chiropractors contracting to be in the HNS network pay fees to HNS based on a percentage of the fees paid by Insurers for in-network services.  (Compl. ¶ 31.)

24.     HNS uses a utilization management ("UM") program, whereby HNS and Defendants review and manage chiropractors based on cost per patient.  (Compl. ¶ 37.)  If a chiropractor's average cost per patient exceeds a mean calculated by HNS by more than 50%, the chiropractor is put on probation and is subject to potential termination. (Compl. ¶ 37.)

25.     Plaintiffs allege that HNS is "like a union which negotiates employment terms for its members," but HNS puts Defendants' interests ahead of those of HNS's network members by exclusively contracting with Defendants to exact fees from chiropractors seeking access to patients covered by Defendants. (Compl. ¶¶ 29–31.)

26.     Plaintiffs contend that HNS's exclusive contracts with Defendants enable a "scheme that reduces the number of medically necessary and appropriate treatments" provided by chiropractors in HNS's network and restrict output by

allowing Defendants to avoid paying for medically necessary and appropriate care. (Compl. ¶ 36.) Plaintiffs assert that the UM program reduces Blue Cross's chiropractic purchases by "millions of dollars per year." (Compl. ¶ 41.)

27. Plaintiffs allege that HNS and Defendants' conduct adversely affects four cognizable markets they define as: "the market in which in-network managed care chiropractic services . . . are provided to [Defendants] and their North Carolina patients through HNS" ("HNS Market"); "the market for in-network chiropractic services provided to individual and group comprehensive healthcare insurers" ("Comprehensive Health Market"); "the market for insurance reimbursed chiropractic services in North Carolina" ("Insurance Health Market"); and "the market for chiropractic services provided in North Carolina" ("North Carolina Market"). (Compl. ¶ 32.) Plaintiffs assert that by virtue of HNS's exclusive relationships with Defendants, HNS controls "100% of the HNS Market and a *materially significant percentage* of the Comprehensive Health Market, the Insurance Market, and the North Carolina Market." (Compl. ¶ 45 (emphasis added).)

28. On August 18, 2017, the Court held that the only relevant market is the North Carolina Market. *Sykes I*, 2017 NCBC LEXIS 73, at *39. The Court now adopts that holding in this case.

## IV. LEGAL STANDARD

29. On a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"), the Court considers "whether the pleadings, when taken as true, are legally sufficient to satisfy the elements of at least some legally

recognized claim." *Arroyo v. Scottie's Prof'l Window Cleaning, Inc.*, 120 N.C. App. 154, 158, 461 S.E.2d 13, 16 (1995) (quoting *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)).  The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Strickland v. Hedrick*, 194 N.C. App. 1, 20, 669 S.E.2d 61, 73 (2008) (quoting *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005)), and it may ignore the plaintiff's legal conclusions, *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

30.     The Court will grant a motion to dismiss under Rule 12(b)(6) when any of three things is true: (1) no law supports the plaintiff's claim, (2) the complaint does not plead sufficient facts to state a legally sound claim, or (3) the complaint discloses a fact that defeats the plaintiff's claim.  *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985).

31.     The Motions must be decided under state law, but the Court may consider federal case law as persuasive authority.  *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 656–57, 194 S.E.2d 521, 530–31 (1973).  When considering federal case law, the Court does not apply the "plausibility" standard adopted by the federal courts. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

## V. ANALYSIS

### A. Plaintiffs do not Satisfy Rule 12(b)(6) Simply by Adhering to Rule 8.

32.     In their abbreviated supplemental briefs, Plaintiffs assert that they have complied with Rule 8's requirement by providing fair notice of their claims such that the Complaint should survive the Motions. (Pls.' Suppl. Br. Concerning Market Power 1–2, ECF No. 70; Pls.' Response Br. Concerning Market Power 1–2, ECF No. 74.) Plaintiffs argue that because at least thirty-four paragraphs in the Complaint allege the existence and abuse of Defendants' market power, Defendants have "fair notice of the transactions and events giving rise to [P]laintiffs' claims," and conclude that "North Carolina law does not require [P]laintiffs to do more to allege market power." (Pls.' Suppl. Br. Concerning Market Power 2.) In so arguing, Plaintiffs make no effort to distinguish between allegations regarding the North Carolina Market and allegations regarding the three more restrictive markets the Court has rejected.

33.     "The general standard for civil pleadings in North Carolina is notice pleading." *Murdock v. Chatham Cty.*, 198 N.C. App. 309, 316, 679 S.E.2d 850, 855 (2009) (citing N.C. Gen. Stat. § 1A-1, Rule 8(a)(1)). "Under this 'notice pleading' standard, 'a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of *res judicata*, and to show the type of case brought.'" *Tillery Envtl. LLC v. A&D Holdings, Inc.*, No. 17 CVS 6525, 2018 NCBC LEXIS 13, at *78 (N.C. Super. Ct. Feb. 9, 2018) (quoting *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 646, 762 S.E.2d 477, 486 (2014)).

34.    However, even if a pleading provides proper notice of "the nature and basis" of a claim sufficient to formulate an answer, the Court must still, under a Rule 12(b)(6) motion, "address the legal sufficiency" of each pleaded claim. *Kingsdown, Inc. v. Hinshaw*, No. 14 CVS 1701, 2015 NCBC LEXIS 30, at *14, 15 (N.C. Super. Ct. Mar. 25, 2015). A pleading that satisfies Rule 8's notice requirement may still be subject to Rule 12(b)(6) dismissal. *Id.* at *13–45 (holding that a counterclaim-plaintiff's claims did not violate Rule 8 and then dismissing with prejudice many of those claims under Rule 12(b)(6)).

35.    The Motions do not depend on and have not asserted a Rule 8 violation, and Defendants do not dispute that they have fair notice of Plaintiffs' claims. The Complaint contains many allegations of Defendants' scheme to leverage and abuse their market power, although many allegations may be more appropriately construed as legal conclusions rather than factual assertions. Still, to the extent that it is necessary to decide the Motions, the Court concludes that the Complaint complies with Rule 8. This holding does not resolve the Motions.

**B.    The Antitrust Claims**

36.    As they did in their *Sykes I* complaint, Plaintiffs group "several different antitrust theories" into a "single, broadly-alleged cause of action labeled 'Price Fixing, Monopsony, and Monopoly'" and assert antitrust claims under sections 75-1, 75-2, and 75-2.1 of the North Carolina General Statutes (the "Antitrust Claims"). *Sykes I*, 2017 NCBC LEXIS 73, at *17.

37.     Section 75-1 of the North Carolina General Statutes prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina." N.C. Gen. Stat. § 75-1 (2015). Section 75-2 prohibits "[a]ny . . . restraint of trade or commerce" that violates common-law principles. *Id.* § 75-2. Section 75-2.1 makes it "unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce" in this State. *Id.* § 75-2.1. Section 75-2.1 also extends to monopsony claims. *See Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1315 (10th Cir. 2017) ("The same general framework for assessing market power applies to monopsony and monopoly situations alike.").

**(1)     Each of the Antitrust Claims require a showing of Defendants' market power in the North Carolina Market.**

38.     For the same reasons explained in the Court's August 18, 2017 Order & Opinion in *Sykes I,* each of Plaintiffs' Antitrust Claims depend on allegations of market power in the North Carolina Market. *Sykes I*, 2017 NCBC LEXIS 73, at *17–18, *23. Nothing in the Complaint justifies a different conclusion. The sufficiency of market power allegations is a "threshold inquiry" for the Antitrust Claims. *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 666 (7th Cir. 1987).

39.     Seller-side market power is the "ability to raise prices above the levels that would be charged in a competitive market." *R.J. Reynolds Tobacco Co. v. Phillip Morris Inc.*, 199 F. Supp. 2d 362, 381–83 (M.D.N.C. 2002) (quoting *NCAA v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984)). On the buyer side, it is

the ability "to lower input prices below competitive levels, which requires the ability to restrict the quantity demanded of the input." Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 306 (1991). Market power may be alleged based on facts that will provide either direct or circumstantial evidence of that power. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Direct evidence "generally requires . . . evidence of restricted output and supracompetitive prices." *Sykes I*, 2017 NCBC LEXIS 73, at *61. Circumstantial evidence is more typical and often focuses on the structure of the market. *Rebel Oil*, 51 F.3d at 1434. To allege market power circumstantially, a plaintiff must properly define a relevant market, allege facts adequate to show that a defendant owns a dominant share of that market, and allege that there are significant barriers to entry to that market. *Id.*; *see also Sykes I*, 2017 NCBC LEXIS 73, at *61 (noting that indirect proof of market power requires proof "of ownership of a dominant share of the relevant market and significant barriers to market entry").

**(2)** **Plaintiffs' allegations of a reduction in output of chiropractic services in rejected submarkets do not justify a presumption of Defendants' market power in the North Carolina Market.**

40.    Plaintiffs argue that they have adequately alleged market power simply by asserting that "tens of millions of dollars of medically necessary care . . . has not been provided" pursuant to HNS's UM program. (Pls.' Br. Opp. Defs.' Mot. Dismiss 12–13, ECF No. 40; Compl. ¶ 41.) Plaintiffs claim that such an allegation of an output restriction itself "establishes market power." (Pls.' Br. Opp. Defs.' Mot. Dismiss 13.) Plaintiffs correctly note that "proof of actual detrimental effects, such as a reduction

of output, can obviate the need for an inquiry into market power." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986). Judge Sotomayor while serving on the United States Court of Appeals for the Second Circuit wrote that "[i]f a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." *Todd v. Exxon Corp.* 275 F.3d 191, 206 (2d Cir. 2001).

41. However, Plaintiffs conflate their allegation of a reduction of output *in markets the Court has rejected* with an allegation of reduction of output *in the North Carolina Market*. Plaintiffs seem to suggest that because Defendants have allegedly caused a reduction in output of chiropractic services by *in-network chiropractors*, (*see, e.g.*, Compl. ¶¶ 38, 41, 97), it can be reasonably inferred that Defendants have caused a reduction in output among *all chiropractors* in the North Carolina Market.

42. Even if the Court did not have the benefit of discovery in *Sykes I*, which informs how inferences might be drawn from the factual allegations in the Complaint in this case, the Complaint asserts no facts that suggest more than a shift in output from the in-network insured market to other segments of the larger North Carolina Market. Significantly, the Complaint itself establishes that approximately one thousand licensed North Carolina chiropractors are *not* HNS members. (Compl. ¶¶ 27–28.) Accordingly, the Court concludes that Plaintiffs have not alleged a clear restriction of chiropractic services in the North Carolina Market adequate to relieve Plaintiffs of their burden to allege facts regarding Defendants' market power in that market.

**(3) Plaintiffs fail to allege specific facts adequate to support a finding of Defendants' market power in the North Carolina Market.**

43. Beyond alleging a reduction in output, the thrust of Plaintiffs' factual assertions of market power involve two main, related contentions. First, Plaintiffs contend that Defendants conspired together to reduce output, so the Court should aggregate the Defendant's individual market shares. (Pls.' Br. Opp. Defs.' Mot. Dismiss 9 ("The market power of the conspiracy is relevant; plaintiffs do not need to allege or prove that each insurer [individually] has market power.").) Second, Plaintiffs argue that the market power of all Defendants, especially Blue Cross's alleged market power, is adequate to support a finding of combined market power by all co-conspirators in the North Carolina Market. (*See, e.g.*, Compl. ¶¶ 7, 45.)

44. In propounding their conspiracy theories, Plaintiffs attempt to allege both an implied horizontal agreement among Insurers and separate vertical agreements between Insurers and HNS, thereby attempting to allege "a collection of vertical and horizontal agreements." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015). Such a combination is sometimes referred to as a "hub-and-spokes" or "rimmed wheel" conspiracy. *See, e.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (hub and spokes); *In re Nat'l Ass'n of Music Merchs.*, MDL No. 2121, 2011 U.S. Dist. LEXIS 94302, at *5 (S.D. Cal. Aug. 22, 2011) (rimmed wheel).

45. In general, the Supreme Court of the United States has distinguished between agreements among competitors (horizontal agreements) and agreements on

different levels of distribution (vertical agreements). Certain horizontal agreements—including agreements among competitors to fix prices, divide markets, and refuse to deal—"always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 19–20 (1979); *see, e.g.*, *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397–98 (1927) (horizontal price fixing); *United States v. Topco Assocs.,* 405 U.S. 596, 608 (1972) (horizontal market division); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284, 293–94 (1985) (concerted refusal to deal). Such agreements "are presumed unreasonable and thus considered illegal *per se.*" *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, No. 16 CVS 16404, 2017 NCBC LEXIS 33, at *45 (quoting *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016)).

46. On the other hand, vertical agreements—including conspiracies between market participants at different levels of distribution—are generally considered under the rule of reason, whereby Courts "examine 'the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed,' to determine the effect on competition in the relevant product market." *In re Musical Instruments*, 798 F.3d at 1191–92 (quoting *Nat'l Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 692 (1978)). "[T]he line between horizontal and vertical restraints can blur," as some conspiracies include "both direct competitors and actors up and down the supply chain, and hence consist of both horizontal and vertical agreements." *In re Musical Instruments*, 798 F.3d at 1192.

47.     Plaintiffs may allege a "hub-and-spokes" or "rimmed wheel" conspiracy in an effort to combine the market power of horizontal participants. Such a conspiracy

> involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy. The rim of the wheel is the connecting agreements among the horizontal competitors . . . that form the spokes.

*Howard Hess Dental Labs.*, 602 F.3d at 255 (citing *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,* 552 F.3d 430, 435 n.3 (6th Cir.2008). Plaintiffs contend that HNS is a hub, the Insurers are spokes in a wheel around that hub, and that common interest and an implied agreement connect the Insurers into a rimmed wheel.

48.     Where the horizontal participants are adequately and commonly tied to the vertical member, courts may aggregate the market power of the horizontal market participants comprising the rim. *See, e.g.*, *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000) (upholding the FTC's analysis in aggregating several toy manufacturers' market power when the manufacturers had conspired with each other and Toys "R" Us to restrain trade in various ways). But, to allege a rimmed wheel conspiracy, a plaintiff must allege either an express agreement between defendants or facts that, "if proved at trial, would be sufficient to permit the inference of agreement between the . . . defendants, the rim of the conspiracy." *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1067 (D. Md. 1991); *see also Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764 (1984) ("There must be evidence that tends to exclude the possibility that the [alleged conspirators] were acting independently.");

*In re Nat'l Ass'n of Music Merchs.*, 2011 U.S. Dist. LEXIS 94302, at *16 (citing *Toys "R" Us*, 221 F.3d at 931–36) (holding that rimmed wheel conspiracies require "either an agreement or understanding that other 'spokes' would cooperate in the conspiracy"). Such an inference is not automatic; a plaintiff must allege facts tending to show that the competitors would benefit only if all the competitors participated in the scheme. *See, e.g.*, *Va. Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 282 (4th Cir. 2002) (holding that that concerted activity is "activity in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, *but for the concert*, would naturally be frustrated by their competing interests") (emphasis added).

49. Mere knowledge of a competitor's business practice, without more, does not establish an agreement between competitors, even if competitors adopt the same practice. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 330 (3d Cir. 2010) (holding that competitors' sharing of information did not "plausibly suggest a conspiracy among the insurers" and that such allegations were "at least equally consistent with unconcerted action"). Accordingly, when unable to allege an actual direct agreement among the horizontal participants, a plaintiff must allege facts tending to show that each defendant understood and agreed to cooperate in the conspiracy and that each defendant would only benefit from the conspiracy if all defendants participated in the scheme.

50. If horizontal competitors are inadequately tied together, the allegations may be no more than a "rimless wheel" conspiracy, where aggregation of market

power is not permitted. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002). In a "rimless wheel" conspiracy, "various defendants enter into separate agreements with a common defendant, but . . . the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Id.* at 203 (citing *Kotteakos v. United States,* 328 U.S. 750, 755 (1946)). Such conspiracies are not a single conspiracy, but many. *Dickson*, 309 F.3d at 203–04 (citing *Kotteakos*, 328 U.S. at 755) ("[T]he Supreme Court was clear: a wheel without a rim is not a single conspiracy."); *In re Musical Instruments*, 798 F.3d at 1199 n.3 (describing a rimless wheel conspiracy as simply "a collection of purely vertical agreements"). A plaintiff who alleges a rimless wheel conspiracy "may not aggregate the respective market shares of individual defendants to establish market power." *Ralph C. Wilson Indus., Inc. v. Am. Broad. Companies, Inc.*, 598 F. Supp. 694, 704 n.10 (N.D. Cal. 1984), *aff'd* 794 F.2d 1359 (9th Cir. 1986); *Dickson*, 309 F.3d at 210 (holding that the lack of a conspiracy between defendants on the same level of distribution precluded the court from aggregating their market power).

51. Here, Plaintiffs have not alleged an express agreement between Insurers to reduce output of medically necessary chiropractic care. Indeed, Plaintiffs admit that Insurers acted at least somewhat independently by entering into agreements with HNS at different times. (Pls.' Br. Opp. Mot. Dismiss 3.) There is no allegation that one Insurer's contract with HNS was conditioned on HNS contracting with any other Insurer. *Cf. Toys "R" Us*, 221 F.3d at 931–32 (finding concerted action among toy manufacturers and Toys "R" Us when the toy manufacturers agreed to

anticompetitive Toys "R" Us policies "on the condition that their competitors would do the same"). Rather, Plaintiffs depend upon their allegation that "[t]he Insurers are aware of each other and the market power achieved by combining their patient populations under HNS's umbrella." (Compl. ¶ 42.) But mere awareness of a competitor combined with parallel conduct is insufficient to show a horizontal conspiracy. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 330.

52. In its brief, Cigna argues that Plaintiffs cannot "plead an antitrust conspiracy just by showing that [a competitor] followed its competitors into a contract with HNS." (Cigna Healthcare N.C. Reply Supp. Mot. Dismiss 3–4, ECF No. 54.) The Court agrees.

53. As an alternative basis for its ruling, even if the Court is mistaken in concluding that Plaintiffs may not aggregate market power because they have not alleged a rimmed wheel conspiracy, the Court nevertheless concludes that Plaintiffs have failed to allege that Defendants and HNS in combination possess market power in the North Carolina Market.

54. Plaintiffs' allegations potentially applicable to all Defendants are no more specific than:

- "HNS and the Insurers have market power" in the North Carolina Market. (Compl. ¶ 32);

- "by virtue of its exclusive relationships with the Insurers, particularly [Blue Cross], HNS controls . . . a materially significant percentage of the . . . North Carolina Market." (Compl. ¶ 45; *see also* Compl. ¶¶ 38, 43, 44

(each discussing the lack of access to "substantial, relevant, and economically and legally material portions of . . . the North Carolina Market . . . ."));

- HNS, through its contracts with the Insurers, had "monopsony power in the relevant markets" including, presumably, the North Carolina Market. (Compl. ¶ 132); and

- "The Insurers have used their aggregate market power to give HNS the power to collect fees and to impose a [UM] program which does not comply with applicable law and which unjustly enriches the Insurers." (Compl. ¶ 135.)

Plaintiffs make no effort to further define what a "materially significant" percentage might be.

55.     Plaintiffs rely heavily on their allegation that Blue Cross "controls 50% or more of the relevant private health insurance market in North Carolina." (Compl. ¶ 7.)  If the Court had accepted a market limited to insured chiropractic services, the Court might have concluded that Plaintiffs adequately alleged market power, as federal and state courts in North Carolina have found allegations that a defendant possesses at least fifty percent of a relevant market may be adequate to show that the defendant owns a "dominant share" of that market.  *See R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 383 (M.D.N.C. 2002) (finding that an alleged 51.3% market share was sufficient to plead a defendant's dominant share); *compare DiCesare*, 2017 NCBC LEXIS 33, at *48–49 (finding that an

allegation that a defendant possessed "approximately 50%" of the relevant market was sufficient to allege that defendant's dominant share in that market and allowing antirust claims to survive a Rule 12(b)(6) motion), *with Sitelink Software, LLC v. Red Nova Labs, Inc.*, 14 CVS 9922, 2016 NCBC LEXIS 45, at *30–31 (N.C. Super. Ct. June 14, 2016) (holding that an allegation of market share between 35% and 40% was insufficient to survive a Rule 12(b)(6) motion, "even under North Carolina's liberal pleading standard").

56.     However, any alleged market power in a narrow, rejected market does not alone support a conclusion that Blue Cross, alone or in combination with HNS and other Insurers, has market power in the North Carolina Market, which is not restricted to insured chiropractic services. *See Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013) (holding that allegations that defendants had a 60% share in the print book market was insufficient to establish market power in the e-book market where the plaintiffs had made no specific allegations regarding the defendants' market share in the e-book market); *see also Top Rank, Inc. v. Haymon*, No. CV 15-4961-JFW (MRWx), 2015 U.S. Dist. LEXIS 164676, at *22–24 (C.D. Cal. Oct. 16, 2015) (holding that the plaintiff had not adequately pleaded market power in the relevant market in part because the allegations regarding significant market share pertained to markets the court had rejected).

57.     Vague or conclusory allegations of market power in a relevant market may be insufficient to survive a Rule 12(b)(6) motion, even if the market is sufficiently

defined. *See, e.g., Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008) (holding that an allegation that the defendant ranked "number one" in its industry was insufficient to plead market power); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 974 (W.D. Tenn. 2004) (dismissing an antitrust claim when the plaintiff made only conclusory allegations regarding the relevant market and described the defendants' market power using only vague descriptors); *Hip Hop Beverage Corp. v. Monster Energy Co.*, No. 2:16-CV-1421-SVW-FFM, 2016 U.S. Dist. LEXIS 167077, at *14–15 (C.D. Cal. Oct. 26, 2016) (holding that an allegation that a defendant controlled "a major percent" of the relevant market was insufficient to allege market power); *Westlake Servs., LLC v. Credit Acceptance Corp.*, No. CV 15-07490 SJO (MRWx), 2015 U.S. Dist. LEXIS 175643, at *18 (C.D. Cal. Dec. 7, 2015) (holding that an allegation that a defendant had a "predominant market share of and market power in" the relevant market was insufficient to plausibly show that the defendant held sufficient market power).

58.    The Court is "fully cognizant that the Motion[s] must be resolved under North Carolina's lenient Rule 12(b)(6) standard rather than the more exacting federal plausibility standard that governs . . . federal antitrust precedents." *Sitelink*, 2016 NCBC LEXIS 45, at *17.    But "[e]ven North Carolina's more lenient standard . . . does not allow a party to withstand a Rule 12(b)(6) motion based on conclusory allegations that are not supported by underlying factual allegations." *Id.*; *see also id.* at *27 ("[C]ourts do not countenance the pursuit of necessarily broad discovery that relates to defining market power when it is based solely on conclusory

allegations."); *Window World of Baton Rouge, LLC v. Window World, Inc.*, Nos. 15 CVS 1–2, 2016 NCBC LEXIS 82, at \*13–14 (N.C. Super. Ct. Oct. 25, 2016) (rejecting the plaintiffs' argument that market power need not be specifically pleaded to withstand Rule 12(b)(6) dismissal).

59. Applying these principles, the Court finds that Plaintiffs have not adequately alleged any Defendant's market power in the North Carolina Market.

60. As to Blue Cross specifically, Plaintiffs allege that Blue Cross controls at least fifty percent of the private health insurance market, (Compl. ¶ 7), but makes no similar allegation of a percentage of the North Carolina Market that Blue Cross allegedly controls. Plaintiffs also allege in a conclusory manner that Blue Cross has "substantial, relevant, and economically and legally material portions of the . . . North Carolina Market." (Compl. ¶¶ 38, 43, 44.) The Court concludes that these allegations are conclusory and inadequate to survive Blue Cross's Motion as to the Antitrust Claims asserted against Blue Cross.

61. Plaintiffs' Antitrust Claims against Cigna are equally devoid of specific allegations of market power in the North Carolina Market. Plaintiffs refer expressly to Cigna only three times in the Complaint, and none of those references regard Cigna's market power in the North Carolina Market. (Compl. ¶¶ 8, 50, 67 (defining Cigna as a party, describing Plaintiffs' relationships with Blue Cross and Cigna, and describing HNS's contract with Cigna to be Cigna's exclusive provider of in-network chiropractic services, respectively).) Plaintiffs' only allegations of Cigna's market power in the North Carolina Market are allegations of the Defendants' collective

market power, described above, that Defendants collectively: bestowed upon HNS a "materially significant" percentage of the North Carolina Market (Compl. ¶ 45); had "substantial, relevant, and economically and legally material portions of the . . . North Carolina Market" (Compl. ¶¶ 38, 43, 44, 45); and, through their contracts with HNS, had "monopsony power in the relevant markets." (Compl. ¶ 132.)

62.     Plaintiffs' allegations regarding MedCost's market power in the North Carolina Market are similarly deficient. Plaintiffs expressly refer to MedCost one time in the Complaint, (Compl. ¶ 9), and make the same allegations concerning MedCost's market power as they do regarding Blue Cross's market power and Cigna's market power.

63.     In sum, the Court concludes that Plaintiffs have not alleged the requisite power as to any Defendant within the North Carolina Market, whether or not any power any Defendants have in the North Carolina Market could be aggregated. Accordingly, the Motions must be granted as to the Antitrust Claims and they must be dismissed.

**(4)     The Court need not address Defendants' alternative arguments regarding the Antitrust Claims.**

64.     In addition to the arguments described above, one or more of the Defendants also assert that some or all of the Antitrust Claims must fail because:

- A customer is free to choose the services it wants to buy, and a firm generally has the right to deal with who it chooses. (Br. Supp. MedCost's Mot. Dismiss 5–6, ECF No. 30);

- Plaintiffs fail to allege that each vertical agreement restrains trade. (Cigna Healthcare N.C Br. Supp. Mot. Dismiss 12–13);

- Plaintiffs fail to plead an intent to monopolize. (Cigna Healthcare N.C. Br. Supp. Mot. Dismiss 13, ECF No. 32);

- The conduct complained of is the kind of competitive conduct that antitrust laws are meant to foster. (Blue Cross Blue Shield N.C. Br. Supp. Mot. Dismiss 8, ECF No. 33);

- Exclusive dealing arrangements cannot provide sufficient grounds for an antitrust claim in North Carolina. (Blue Cross Blue Shield N.C. Br. Supp. Mot. Dismiss 10);

- Plaintiffs' Antitrust Claims make no economic sense. (Blue Cross Blue Shield N.C. Br. Supp. Mot. Dismiss 16–18);

- Plaintiffs, at base, are essentially seeking to join or otherwise reap the benefits of an alleged cartel, which antitrust laws do not give them the right to do. (Blue Cross Blue Shield N.C. Br. Supp. Mot. Dismiss 19–20);

- Plaintiffs' antitrust arguments rest on the false premise that all chiropractic service is medically necessary. (Reply Br. Supp. MedCost's Mot. Dismiss 3–4, ECF No. 53);

- Plaintiffs fail to plead monopoly power. (Cigna Healthcare N.C. Br. Supp. Mot. Dismiss 12); and

- Plaintiffs cannot plead market power in the North Carolina Market because market realities show that Defendants cannot prevent competitors from entering into that market. (Blue Cross Blue Shield N.C. Suppl. Br. Issue Market Power 9, ECF No. 73; Cigna Healthcare N.C. Suppl. Br. Regarding Issue Market Power Further Supp. Mot. Dismiss 2, ECF No. 72.)

65. The Court does not further address these arguments, having concluded that the Antitrust Claims fail because of Plaintiffs' failure to allege the requisite market power in the North Carolina Market.

## C. Plaintiffs do not have Standing to Pursue Their Chapter 58 Claims

66. Plaintiffs in this case allege the same claims alleged against HNS in *Sykes I* based on North Carolina's insurance code. For the same reasons the Court held in *Sykes I* that Plaintiffs lack standing to assert their claims based on alleged violations of Chapter 58, *Sykes I*, 2017 NCBC LEXIS 73, at \*48–49, the Court holds here that Plaintiffs have no standing assert those claims in this case.

## D. Plaintiffs' Section 75-1.1 Claim is Dismissed.

67. As in *Sykes I*, Plaintiffs seek to restate the Antitrust Claims as a section 75-1.1 claim for an unfair and deceptive trade practice. (Compl. ¶¶ 160–62.)

68. "When a section 75-1.1 claim derives solely from an antitrust claim, the failure of the antitrust claim also defeats liability under section 75-1.1." *Sitelink*, 2016 NCBC LEXIS 45, at \*32 (quoting *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at

396). That is the case here, and Plaintiffs' 75-1.1 claim fails for the same reason that the Antitrust Claims fail, and must be dismissed.

## E. Plaintiffs' Claim for Aiding and Abetting a Breach of Fiduciary Duty is Dismissed.

69. Plaintiffs allege that Defendants "knowingly aided, abetted, induced, and conspired with HNS and the HNS owners . . . to breach HNS's fiduciary duties to Plaintiffs." (Compl. ¶ 174.)

70. As an initial matter, the Court determined in *Sykes I* that there is no factual basis to find that HNS owed a fiduciary duty to its network members. *Sykes I*, 2017 NCBC LEXIS 73, at *69 (holding that "there is no joint venture or other special relationship that arises or may be implied from HNS's contracts or the specific facts alleged in the [*Sykes I*] Complaint to give rise to a fiduciary duty"). There must have been a fiduciary duty and a breach of that duty in order to find that one aided and abetted that breach. *Tong v. Dunn*, No. 11 CVS 1522, 2012 NCBC LEXIS 16, at *12–13 (N.C. Super. Ct. Mar. 19, 2012) (citing *Blow v. Shaughnessy*, 88 N.C. App. 484, 489, 364 S.E.2d 444, 447 (1988)).

71. But even assuming both that such a duty existed and was breached, this Court has now concluded that the Supreme Court of North Carolina will not recognize the claim of aiding and abetting breach of fiduciary duty, *Zloop v. Parker Poe Adams & Bernstein, LLP*, No. 17 CVS 5480, 2018 NCBC LEXIS 16, at *32 (N.C. Super. Ct. Feb. 16, 2018), or alternatively, if it does, the claim's essential elements will include at least proof of: (1) a violation of a fiduciary duty by the primary party; (2) knowledge of the violation by the aiding and abetting party; and (3) substantial assistance by

the aider and abettor in achieving the primary violation. *Tong*, 2012 NCBC LEXIS 16, at \*12–13 (citing *Blow*, 88 N.C. App. at 489, 364 S.E.2d at 447).

72. The Complaint does not allege each of these elements. Accordingly, Plaintiffs' aiding and abetting breach of fiduciary duty claim is dismissed.

## F. Plaintiffs' Declaratory Judgment Claim, Civil Conspiracy Claim, and Request for Punitive Damages are Dismissed.

73. Plaintiffs' declaratory-judgment claim seeks ten distinct declarations, and each recasts substantive claims that the Court has rejected. Accordingly, Plaintiffs' declaratory-judgment claim is dismissed.

74. North Carolina does not allow freestanding claims for civil conspiracy. *Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) (noting that "there is not a separate civil action for civil conspiracy in North Carolina"). As in their *Sykes I* complaint, Plaintiffs' civil conspiracy claim is derivative of the Antitrust Claims and fails for the same reason those claims fail.

75. North Carolina does not allow freestanding claims for punitive damages. *Shugar v. Guill*, 304 N.C. 332, 335, 283 S.E.2d 507, 509 (1981) ("A civil action may not be maintained solely for the purpose of collecting punitive damages but may only be awarded when a cause of action otherwise exists in which at least nominal damages are recoverable by the plaintiff."). Because the Court has dismissed each of the claims against Defendants, Plaintiffs' punitive damages claim must also be dismissed.

## VI.   CONCLUSION

76.    For the reasons stated above, the Court rules as follows:

    (1)    Blue Cross's Motion is GRANTED;

    (2)    Cigna's Motion is GRANTED;

    (3)    MedCost's Motion is GRANTED; and

    (4)    Plaintiffs' Complaint is DISMISSED WITH PREJUDICE.


SO ORDERED, this the 5th day of April, 2018.


/s/ James L. Gale
James L. Gale
Chief Business Court Judge